SOLOMON C. ROSE, PLAINTIFF IN ERROR, V. DANIEL H. O'LINN, DEFENDANT IN ERROR.

**Statute of Frauds.** The servant of A was injured by the wrongful act of B. A physician was called in by B, who went to A's house, where the servant lay, and performed medical services, immediately after which A told him that B was responsible for the accident, adding: " But you need not be at all alarmed, I will see that you are paid," and the physician continued treating the patient until he was cured. *Held*, That the promise of A was void under the statute of frauds.

ERROR to the district court for Washington county. Tried below before SAVAGE, J..

*Jesse T. Davis*, for plaintiff in error.

*Carrigan & Osborn*, for defendant in error.

COBB, J.

The plaintiff in this case assigns for error the giving of the 4th, 5th, 6th, 7th, and 8th instructions, which are in the following words:

" 4. If it was simply an agreement to pay it—if some other party primarily liable did not—it was what is called a collateral promise or a promise to answer for the debt or default of another, and consequently void by what is known as our statute of frauds, for not being in writing.

"5. Illustration of original and collateral promises may be given as follows, which you will understand are merely illustrations: If a person says, 'Go to that pauper and render him services, I will pay you,' that would be an original promise, and need not be in writing. If the promise was to render service for such a person, 'he will pay you, but if he does not I will,' that would be a collateral promise, and should be in writing to be valid.

"6. But then there are cases where the line between original and collateral promises is not so distinctly drawn, and then it is for the jury under all the circumstances of the case to say from the evidence whether the promise was original or not. To decide this you should consider the situation of all the parties, the language; the question to whom the charge was originally made or the credit given is also a very important one in determining this fact.

"7. If you find that defendant Rose directed the plaintiff to go on and attend to the injured person and promised to see him paid, and you further find that such promise was an original one, then your verdict should be for the plaintiff.

"8. When a witness is impeached—that is, when you find from the evidence that his reputation for truth is such that you cannot believe him under oath—then you should disregard the testimony of such witness."

The plaintiff below was called as a witness on the trial in his own behalf, and testified as follows:

Q. Did you have any conversation with Mr. Rose concerning who should pay you? If so, state that conversation entire.

A. I had a conversation with Mr. Rose. He stated how the accident occurred. He said that a neighbor of his, Mr. Whisenand, had driven a cow down in his herd. He had a bull in his herd, and Mr. Whisenand

had driven a cow down there against his express or-
ders before—that is, it was generally understood no
cows were to go into the herd without express orders
from himself. In separating this cow from the herd,
the bull ran against the pony of his herder, and in
doing so had thrown him off—he being a cripple and
unable to sit on a horse as a man naturally would.
That was about the statement he gave as to how the
accident occurred. Then he went on to state, in the
bed-room where the man was that had got injured,
that he was going to see that Mr. Whisenand should
pay a portion of the bill because he was responsible
for the accident. After I had adjusted the fracture
and applied the dressing, we went out to the breakfast
table. Mr. Rose seemed to be very much excited, and
he went on and stated in this language, as near as I
can remember, after telling the circumstances over
again : "But, doctor, you need not be at all alarmed
about your bill; I will see that you are paid."

Q. Did he say anything about your continuing
your treatment?

A. He wanted the case attended to, and I did at-
tend to it, until the fracture was knit and the splints
removed.

It is claimed by the plaintiff in error that the above
testimony brings the case within the provisions of the
statute known as the statute of frauds, and that the
promise of plaintiff in error to see that the defendant
in error was paid is void, because of " such agree-
ment, or some note or memorandum thereof, 'not' be-
ing in writing and subscribed by the party to be
charged therewith."

To present the point in its true light, it should be
stated that Ira Lee—the person whose broken thigh
was set and cured by the defendant in error, a physi-
cian and surgeon—was the hired laborer of the plain-

tiff; that the son of the Mr. Whisenand spoken of by the plaintiff in error, as stated by the defendant in error in his testimony, went for a physician by direction of his father. Whisenand, when about starting his son for a physician, asked plaintiff in error if it made any difference which doctor was sent for. He replied that he did not know as it made any difference to him. Young W. then went for and obtained defendant in error.

In the case of *Leonard v. Vredenburgh*, 8 Johns., 29, Chief Justice Kent, in delivering the opinion of the court, after citing many English and American cases, says: "There are then three distinct classes of cases on this subject, which require to be discriminated: 1. Cases in which the guaranty or promise is collateral to the principal contract, but is made at the same time and becomes an essential ground of the credit given to the principal or direct debtor. 2. Cases in which the collateral undertaking is subsequent to the creation of the debt, and was not the inducement to it, though the subsisting liability is the ground of the promise, without any distinct and unconnected inducement. Here must be some further consideration shown, having an immediate respect to such liability, or the consideration for the original debt will not attach to this subsequent promise * * *. 3. A third class of cases, and to which I have already alluded, is when the promise to pay the debt of another arises out of some new and original consideration of benefit or harm moving between the newly contracting parties."

The first two classes are within the statute of frauds, but the last is not.

Although it can scarcely be said that any construction of the statute of frauds is settled law, yet I find the above case so often referred to and cited that I

deem it safe to adopt the principles there laid down, and if we find the case at bar coming within the same and falling within either of the three classes into which that eminent jurist has divided the subject, we will have to follow it.

It is not claimed, nor could it be, that Rose stood in any such relation to Lee as made him liable to pay for his (Lee's) surgical treatment; nor was Rose in any manner responsible for the calling of Dr. O'Linn in the first place, and so if he is liable at all his liability grows out of the contract made after the operation on the limb had been performed by the doctor—out of the words spoken at the breakfast table.

The doctor had been called in the middle of the night; he had procured a conveyance and driver at a livery stable; had been driven sixteen miles, arriving there at day-light; had performed an important surgical operation, and, as the sequel shows, had done it skillfully and well. At this point it is a plain proposition that somebody was liable to pay the surgeon for this service, and it is equally clear that that somebody was not Rose. For he stood in no relation to the subject of the services and up to this time had done nothing to render him liable. In the mean time valuable services had been performed, for which somebody was originally liable to pay. If we stop here there is a perfect cause of action for a part of the doctor's claim, but not against Rose. If by speaking the words at the breakfast table Rose became liable, what was the character of his liability? Certainly not original, because we have examined the contract in its original state and seen that Rose was not there. So such liability must be a collateral one.

I think that the case falls substantially within the second class as divided by C. J. Kent. In the case at bar the debt was not created or the contract made by

a single act, like the execution of a note, as in *Leonard v. Vredenburgh, supra*, but extended over a period of several weeks. The promise of Rose was made after the rendering by the doctor of an important part of the services upon which the indebtedness arose, after the relation of physician and patient had been established between Dr. O'Linn and Lee, and the relation of debtor and creditor between the doctor and whoever was primarily responsible for his employment, and we have already seen that that was not Rose. The doctor says in his testimony that Rose "wanted the case attended to,"—that is, continued. He does not say how he expressed that want. But I think that might be inferred from the words used, "I will see that you are paid." The doctor did continue the treatment, and such continuation of the treatment was a sufficient consideration for the promise to bring the case within the said second class. I therefore come to the conclusion that the case is within the prohibition of the statute of frauds; that the promise of Rose not being in writing, nor subscribed by him, is void.

I think the fifth instruction given in the charge to the jury in the trial court was calculated to mislead the jury in this—that the subject of the illustration, as well as the manner of stating it, was calculated to impress two points upon the minds of the jury, neither of which was warranted by the testimony: first, that Lee was a pauper, and second, that Rose was the original cause of the doctor treating him.

But I place this opinion squarely on the ground that the verdict is not sustained by any legal or binding contract.

The judgment of the district court is therefore reversed and the cause remanded for a new trial.

REVERSED AND REMANDED.

MAXWELL, CH. J., dissenting.

It appears from the bill of exceptions that in the summer of 1876 one Lee, a minor and cripple, was employed by the plaintiff in error to herd his stock, and while engaged in this employment, in consequence of plaintiff's bull running against his horse, was thrown from the same, producing a fracture of the thigh bone. A son of Mr. Whisenand was sent to Blair for a doctor to attend Lee, the character of the injuries at that time not being fully known. This messenger called upon Dr. O'Linn, and requested him to go to the plaintiff's house and attend Lee, which he did, arriving there about four o'clock in the morning, the distance being about sixteen miles.

The only question to be determined is, whether or not the plaintiff in error employed the defendant in error to perform the services set forth in the petition. The doctor testifies that: "After I had adjusted the fracture and applied the dressing we went out to the breakfast table. Mr. Rose seemed to be very much excited, and he went on and stated in this language as near as I can remember after telling the circumstances over again : ' But doctor, you need not be at all alarmed about your bill; I will see that you are paid.' "

Q. Did he say anything about your continuing your treatment?

A. He wanted the case attended to, and I did attend it until the fracture was knit and the splints removed.

On cross-examination he also testified: " Mr. Rose told me that he would make Mr. Whisenand pay a portion of the bill. He told me also that I needn't be alarmed about my bill; that he would pay my bill."

One Lampher, a disinterested witness, who was

present, also testifies: "I think Mr. Rose stated he was going to make some one pay part of the bill, for he felt he was responsible for it, but if he couldn't he said: 'Doctor, you needn't be alarmed at all, for I will see that you have your pay.'"

Q. Did he say anything about the doctor attending him further?

A. He said he wanted good care taken of him, and he would see that he got his pay.

It appears from the testimony that Lee (the party injured) did not send for the doctor, and no claim is made by the plaintiff that the employment was at Lee's request. In determining at whose request the services were rendered it will be well to consider that the injury was caused by the plaintiff's bull, an animal that he shows to have been dangerous under certain circumstances. Suppose instead of personal injuries to Lee his clothing had been entirely destroyed, and the plaintiff in error had sent a messenger to Blair to obtain a suit of clothes for him, could the plaintiff in error resist the payment of the debt by saying that the clothing was for Lee? The clothing was sold to the plaintiff in error, although another had the benefit of it. The promise was not to pay the debt if another did not, but to pay the debt. Does it make any difference because the request was to render professional services and not to furnish goods? Some one employed the defendant in error to perform the services required. Who did it? It was not Lee. Was it the plaintiff in error? In my opinion the testimony proves conclusively that the services of the defendant in error in this case were rendered at the request of the plaintiff.

It is not sought in this action to charge the plaintiff in error as *master*, but for services rendered at his request. He does not allege that Lee is liable for the debt,

Rose v. O'Linn.

but claims that Whisenand should pay, because he drove the cow into the herd. But the record fails to show that the employment was at the request of Whisenand. The plaintiff seeks to escape liability by stating that before the doctor adjusted the fracture he notified him that he would not be responsible. His testimony on that point is as follows: "The first thing he (the doctor) examined to see if the leg was broke. He said, 'Mr. Rose, you can see plain enough the leg is broke;' and he went to work to fix to set it. He was working at it then; and about the time he got ready to set it I opened the conversation myself. I told Dr. O'Linn that I had nothing to do with the bill—that Whisenand should pay it, because he was the sole cause of his getting hurt; that was in the bed-room." If the employment was by Whisenand, is it not remarkable that the plaintiff should have thought it necessary at the time the doctor was adjusting the fracture to state to him that Whisenand should pay the bill? He would have us believe, too, that while the patient was writhing in pain, and perhaps his life depending on the prompt and skillful adjustment of the fracture, he then informed the doctor that Whisenand should pay. The doctor is shown to have hired a livery team, carriage, and driver, and to have promptly answered the summons, and had already incurred considerable expense in doing so. And the plaintiff's testimony, even if true does not entirely discharge him from liability. But the testimony being conflicting, it was the province of the jury to determine the degree of credibility to be given to the witnesses. And this they have done, and have found that the plaintiff is liable for the debt; and I do not see, from the testimony, how they would have been justified in finding otherwise. The services were rendered faithfully and well. No objection is made to the amount of the bill. The con-

duct of the plaintiff appears to me like an attempt to evade the payment of a just debt. It is evident that justice has been done in the premises, and the judgment should be affirmed. For these reasons, I cannot concur in the opinion of the majority of the court.